# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

KELLYANN SINGLETON,
o/b/o J.R.S.,                                      Plaintiff,

          v.                                                                    5:15-CV-1523
                                                                                (ATB)
COMMISSIONER OF SOCIAL SECURITY,

                                                   Defendant.

HOWARD D. OLINSKY, ESQ., for Plaintiff
SERGEI ADEN, Special Asst. U.S. Attorney for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## MEMORANDUM DECISION and ORDER

This matter was referred to me, for all proceedings and entry of a final judgment, by the Honorable Brenda K. Sannes, United States District Judge, by Order dated September 7, 2016 (Dkt. No. 14), in accordance with the provisions of 28 U.S.C. § 636 (c), Fed. R. Civ. P. 73, N.D.N.Y. Local Rule 73.1, and the consent of the parties.

## I.    PROCEDURAL HISTORY

Plaintiff Kellyann Singleton protectively filed[1] an application for Supplemental Security Income ("SSI") payments on behalf of her son, J.R.S.,[2] on July 17, 2012,

---

[1] When used in conjunction with an "application" for benefits, the term "protective filing" indicates that a written statement, "such as a letter," has been filed with the Social Security Administration, indicating the claimant's intent to file a claim for benefits. *See* 20 C.F.R. § 416.340. There are various requirements for this written statement. *Id.* If a proper statement is filed, the Social Security Administration will use the date of the written statement as the filing date of the application even if the formal application is not filed until a later date.

[2] Throughout this Report, the child on whose behalf this action was brought will be generally referred to as "the claimant" or by his initials J.R.S. Kellyann Singleton who commenced this action on behalf of her son, will generally be referred to as "the plaintiff."

claiming disability beginning on that date due to a "learning disability."
(Administrative Transcript ("T.") at 158). Plaintiff's application was initially denied on
October 17, 2012 (T. 74), and she made a timely request for a hearing before an
Administrative Law Judge ("ALJ"). (T. 83). On December 4, 2013, Kellyann Singleton
appeared for the hearing, which was postponed in order for plaintiff to obtain counsel.
(T. 53-61). A second hearing was held on February 10, 2014, before ALJ Elizabeth W.
Koennecke. The hearing was attended by J.R.S.'s father – Trevor Singleton. (T. 36-
61). Mr. Singleton also appeared without a "representative," but the ALJ proceeded
with the hearing.[3] (T. 36).

In a decision dated April 29, 2014, the ALJ found that J.R.S. was not disabled.
(T. 19-30). The ALJ's decision became the final decision of the Commissioner when
the Appeals Council denied plaintiff's request for review on November 3, 2015. (T. 1-
4).

## II.   ISSUES IN CONTENTION

The plaintiff makes the following arguments:

(1)   The ALJ  erred in failing to find that J.R.S.'s Post Traumatic Stress
      Disorder ("PTSD") was a "severe" impairment. (Pl.'s Br. at 10-12) (Dkt.
      No. 12).

(2)   The ALJ erred in failing to find that J.R.S. has a marked limitation in
      acquiring and using information. (Pl.'s Br. at 13-17).

Defendant argues that the Commissioner's decision is supported by substantial

---

[3] The ALJ reminded Mr. Singleton that the previous hearing was adjourned at Ms. Singleton's request "in order to obtain a representative. (T. 36). The ALJ stated "You've appeared today without [a representative], so I'm assuming that no one was willing to take the case." (*Id.*) Mr. Singleton responded "I guess not." (*Id.*) J.R.S. did not appear at either hearing, and Ms. Singleton did not appear at the rescheduled hearing. (T. 36, 55).

evidence and the complaint should be dismissed. For the following reasons, this court agrees with defendant and will recommend dismissal of the complaint.

## III. APPLICABLE LAW

### A. Disability Standard

An individual under the age of eighteen is disabled, and thus eligible for SSI benefits, if he or she has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(C)(I). *See Hudson v. Astrue*, 1:06-CV-1342 (LEK/VEB), 2009 WL 1212114, at *3-4 (N.D.N.Y. Apr. 30, 2009) (discussing the standard for children's disability benefits). However, that definitional provision excludes from coverage any "individual under the age of [eighteen] who engages in substantial gainful activity. . . ." 42 U.S.C. § 1382c(a)(3)(C)(ii).

The agency has developed a three-step process to be employed in determining whether a child can meet the statutory definition of disability. 20 C.F.R. § 416.924; *Kittles v. Barnhart*, 245 F. Supp. 2d 479, 487-88 (E.D.N.Y. 2003); *Ramos v. Barnhart*, 02 Civ. 3127, 2003 WL 21032012, at *7 (S.D.N.Y. May 6, 2003). The first step of the test requires a determination of whether the child has engaged in substantial gainful activity. 20 C.F.R. § 416.924(b); *Kittles*, 245 F. Supp. 2d at 488. If so, then by statute and by regulation, the child is ineligible for SSI benefits. 42 U.S.C. § 1382c(a)(3) (C)(ii); 20 C.F.R. § 416.924(b).

If the child has not engaged in substantial gainful activity, the second step of the

test requires examination of whether he or she suffers from one or more medically determinable impairments that, either alone or in combination, are properly regarded as "severe," in that they cause more than a minimal functional limitation. 20 C.F.R. § 416.924(c); *Kittles*, 245 F. Supp. 2d at 488; *Ramos*, 2003 WL 21032012, at *7. If the child is found to have a severe impairment, the Commissioner must then determine, at the third step, whether the impairment meets or equals a presumptively disabling condition identified in the listing of impairments set forth in 20 C.F.R. Pt. 404, Subpt. P., App. 1. *Id*. Equivalence to a listing can be either medical or functional. 20 C.F.R. § 416.924(d); *Kittles*, 245 F. Supp. 2d at 488; *Ramos*, 2003 WL 21032012, at *7. If an impairment is found to meet, or qualify, as medically or functionally equivalent to, a listed impairment, and the twelve-month durational requirement is satisfied, the claimant will be found to be disabled. 20 C.F.R. § 416.924(d)(1); *Ramos*, 2003 WL 21032012, at *8.

"Functional" equivalence must be examined only if it is determined that the claimant's impairment does not meet or *medically* equal the criteria for a listed impairment. Analysis of functionality involves considering how a claimant functions in six main areas referred to as "domains." 20 C.F.R. § 416.926a(b)(1); *Ramos*, 2003 WL 21032012, at *8. The domains are described as "broad areas of functioning intended to capture all of what a child can or cannot do." 20 C.F.R. § 416.926a(b)(1). Those domains include: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. 20 C.F.R. §

4

416.926a(b)(1).

Functional equivalence is established by finding an "extreme" limitation, meaning "more than marked," in a single domain. 20 C.F.R. § 416.926a(a); *Ramos*, 2003 WL 21032012, at *8. An "extreme limitation" is an impairment which "interferes very seriously with [the claimant's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(I) (emphasis added).

Alternatively, a finding of disability is warranted if a "marked" limitation is found in any two of the listed domains. 20 C.F.R. § 416.926a(a); *Ramos*, 2003 WL 21032012, at *8. A "marked limitation" exists when the impairment "interferes seriously with [the claimant's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(I). "A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with the ability to function (based upon age-appropriate expectations) independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.00(C).

## B. Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Talavera v. Astrue*, 697 F3d 145, 151 (2d Cir. 2012)); *Brault v. Soc. Sec. Admin, Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g)). A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal

standards were applied, even if the decision appears to be supported by substantial evidence. *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Talavera*, 697 F.3d at 151 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Id.* However, this standard is a very deferential standard of review " – even more so than the 'clearly erroneous standard.'" *Brault*, 683 F.3d at 448.

An ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision. *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984). "To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id. See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ

explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot "'pick and choose' evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

## IV.    FACTS

Plaintiff's counsel has extensively outlined the facts in this case, including the testimony before ALJ Koennecke. (Pl.'s Br. at 2-9). Defense counsel has also included a lengthy discussion of the facts. Rather than reciting this evidence at the outset, the court will discuss the relevant details below, as necessary to address the issues raised by plaintiff.

## V.    <u>ALJ's DECISION</u>

The ALJ found that J.R.S. was born on December 24, 2004, making him a "school-age" child on July 17, 2012, the date that his SSI application was filed. (T. 22). He was still a school-age child at the time of the hearing decision, and he had not engaged in substantial gainful activity "at any time relevant to this decision." (*Id.*) The ALJ found that J.R.S.'s learning disability and his speech/language delay were severe impairments. (*Id.*) However, J.R.S.' s severe impairments did not meet or medically equal one of the listed impairments in Appendix 1. (*Id.*) The ALJ considered whether J.R.S. met Listing 112.05 (Intellectual Disability), but determined that J.R.S. was "not close to meeting the necessary criteria of any paragraph within the listing." (*Id.*)

The ALJ then considered whether J.R.S. had an impairment or combination of impairments that functionally equaled the Listings. (*Id.*) The ALJ considered J.R.S.'s

limitations in each of the relevant domains, stating that she considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," based on the regulations and the Social Security Rulings ("SSR"). (T. 23). The ALJ noted that plaintiff alleged that J.R.S. was disabled only due to a "learning disability." (T. 23) (citing Exh. 6E, p.2 – T. 162). J.R.S.'s mother stated that he had some difficulty with reading, writing, and math, he misuses words, mispronounces words, and is unable to say certain words and sounds. (T. 23) (citing Exh. 7E, p.1 – T. 168). The ALJ determined that J.R.S.'s medically determinable impairments could reasonably be expected to cause the alleged symptoms, but found that J.R.S.'s mother's and father's statements concerning the intensity, persistence, and limiting affects of their son's symptoms were not "entirely credible," because they were "unsupported by competent medical evidence and opinion and contradicted by other evidence." (T. 23).

The ALJ analyzed each of the domains, and determined that J.R.S. had less than marked limitation in acquiring and using information, but he had a "marked" limitation in attending and completing tasks. (T. 25-26). He had a "less than marked" limitation in interacting and relating with others and in health an physical well-being. (T. 27, 29). J.R.S. had no limitation in moving about and manipulating objects and caring for himself. (T. 28-29). The only domain at issue in this case is acquiring and using information."[4]

---

[4] Plaintiff argues that the ALJ should have found a "marked" limitation in the domain of acquiring and using information, which together with J.R.S.'s marked limitation in attending and completing tasks, would have given J.R.S. the two "marked" limitations that he needed to be deemed

The ALJ specified the weight that she afforded to the reports of J.R.S.'s teachers, stating that she gave "great weight" to J.R.S.'s special education teacher – Nancy Rummans, who had frequent contact with J.R.S. and "no financial interest in the outcome of the decision." (T. 24) (citing Exh. 16E – T. 195-203). The ALJ noted that Ms. Rummans's opinion was "even less limiting" than the opinion of the non-examining reviewers, and that her questionnaire would not support a "marked" limitation in "any" domain. (T. 24). The ALJ gave "some weight" to a consultative report, written by Dennis Noia, Ph.D., and stated that Dr. Noia's report would have been given more weight if he had provided a "domain-by-domain breakdown of abilities and limitations." (T. 24).

The ALJ gave great weight to K. Prowda, M.D. and to speech language pathologist J. Weir, who were non-examining consultants. (T. 24). These individuals found a "less than marked" limitation in acquiring and using information. (T. 24) (citing Exh. 1A, pp.8 – T. 69).[5] In support of this finding, these individuals relied upon J.R.S.'s intelligence evaluations, which found that J.R.S.'s IQ scores were less than two standard deviations below the mean and J.R.S.'s Individualized Educational Program ("IEP"), which cited only a speech/language impairment. (T. 24) (citing Exh. 1A, p.6 – T. 67).

In determining that J.R.S. has a "less than marked" limitation in acquiring and

disabled under the statute.

[5] The non-examiner's "Domain Evaluations" appear at T. 67-69. The analysis of acquiring and using information appears at T. 67-68.

using information, the ALJ found that Ms. Rummans noted several "obvious" problems, only one "serious" problem, and no "very serious" problems. (T. 25) (citing Exh. 16E, p.3 – T. 197). Ms. Rummans stated that J.R.S. could read and write independently, but his written work was "labored," and that understanding and using grade level content vocabulary was hard for him. (T. 25). However, the ALJ noted that J.R.S. had undergone intelligence evaluations, and his IQ scores were "less than two standard deviations below the mean." (*Id.*) (citing Exhs. 1F, 2F, and 4F – T. 238-40, 242-44, 260-65).

One report indicated that plaintiff had "excellent non-verbal abilities," that his abstract reasoning was well developed, and that his categorical reasoning and visual analytic skills were good. (T. 25) (citing Exh. 2F, p.2 – T. 243). J.R.S. enjoyed using the computer and enjoyed math, particularly when he was learning about sorting and graphing. (*Id.*) (citing Exh. 9E, p.3 – T. 175). Finally, the ALJ cited Dr. Noia, who found that J.R.S. recalled and understood instructions, his style of responding was deliberate, orderly, and self-correcting, and he worked with reflection and deliberation. (*Id.*) (citing Exh. 4F, p.2 – T. 261).

The ALJ specifically considered the remaining domains individually. (T. 25-30). Based on the ALJ's finding that J.R.S. did not have one "extreme" or two "marked" limitations in the six domains of functioning, ALJ Koennecke determined that J.R.S. was not disabled. (T. 30).

## VI.  Severe Impairment

### A.    Legal Standards

The claimant bears the burden of presenting evidence establishing severity at Step Two of the disability analysis. *Briggs v. Astrue*, No. 5:09–CV–1422 (FJS/VEB), 2011 WL 2669476, at *3 (N.D.N.Y. Mar. 4, 2011) (Rep.-Rec.), *adopted*, 2011 WL 2669463 (N.D.N.Y. July 7, 2011).  A severe impairment in relationship to a claimant who is 18 years or older, is one that significantly limits the plaintiff's physical and/or mental ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c); *see also* 20 C.F.R. § 404.1521(a) (noting that an impairment is not severe at Step Two if it does not significantly limit a claimant's ability to do basic work activities).  With respect to children, who are under 18, "an impairment(s) is considered 'not severe' if it is a slight abnormality(ies) that causes no more than minimal limitation in the individual's ability to function independently, appropriately, and effectively in an age-appropriate manner." SSR 96-3p, 1996 WL 374181, at *1 (July 2, 1996).

"Severity" is determined by the limitations imposed by an impairment, and not merely its by diagnosis.  The mere presence or diagnosis of a disease or impairment is not, by itself, sufficient to deem a condition severe. *Hamilton v. Astrue*, No. 12-CV-6291, 2013 WL 5474210, at *10 (W.D.N.Y. Sept. 30, 2013) (quoting *McConnell v. Astrue*, No. 6:03-CV-521, 2008 WL 833968, at *2 (N.D.N.Y. Mar. 27, 2008)).  The Second Circuit has held that the Step Two analysis "may do no more than screen out *de minimis* claims." *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995).

Often, when there are multiple impairments, and the ALJ finds some, but not all

of them severe, an error in the severity analysis at step two may be harmless because the ALJ continued with the sequential analysis and did not deny the claim based on the lack of a severe impairment alone. *Aviles v. Comm'r of Soc. Sec.*, No. 15 Civ. 2992, 2016 WL 1642645, at *4 (E.D.N.Y. Apr. 25, 2016), *appeal docketed*, No. 16-2142 (2d Cir. June 23, 2016). In *Aviles*, the court determined that the ALJ's failure to discuss whether the child's Disruptive Behavior Disorder ("DBS") was severe was harmless error when the ALJ found that the child's Attention Deficit Hyperactivity Disorder ("ADHD") was severe, and therefore, continued to step three of the sequential analysis as it related to child's benefits.[6] *Id.* (citing *Jones Reid v. Astrue*, 934 F. Supp. 2d 381, 401 (D. Conn. 2012), *aff'd*, 515 F. App'x 32 (2d Cir. 2013); *Stanton v. Astrue*, 370 F. App'x 231, 233 n.1 (2d Cir. 2010)). The court in *Aviles* found that the ALJ "clearly considered plaintiff's behavioral issues at step three of the analysis. These issues included the behavior *encompassed under DBS, such as difficulty with authority figures.*" *Id.* (emphasis added). *See also Gonzalez ex rel. T.H. v. Colvin*, No. 3:13-CV-979, 2015 WL 540690, at *19 (D. Conn. Feb. 10, 2015) (finding harmless error where ALJ found other impairments severe at step two and proceeded to consider the "remaining steps," which in a child's case, included the analysis of the six domains, which encompassed domains that were directly related to the impairment that the ALJ failed to find severe).

---

[6] As stated above, the analysis of child's benefits only encompasses three steps because in order to be considered disabled, a child's impairment(s) must either meet or be functionally equivalent to a Listed Impairment. *Brown ex rel. J.B. v. Colvin*, No. 1:12-CV-1062, 2015 WL 1647094, at *2 (W.D.N.Y. Apr. 14, 2015) (citing *Encarnacion ex rel. George v. Astrue*, 586 F.3d 72, 75 (2d Cir. 2009) (citing 20 C.F.R. § 416.924 et seq.)).

## B.    Application

Plaintiff argues that the ALJ erred in failing to find that J.R.S.'s PTSD was a severe impairment at step two, and further argues that the error was not harmless because the PTSD was never considered at step three. (Pl.'s Br. at 10-12).  It appears that J.R.S. was diagnosed with PTSD and "Separation Anxiety" in November or 2011 or in February of 2012,[7] at the Brownell Center for Behavioral Health ("BCBH"). (T. 274).  However, this diagnosis was well before plaintiff's application date in July of 2012, and other than "separation anxiety" and problems with his sister,[8] there are no actual functional limitations associated with the diagnosis of PTSD.

The initial assessment from BCBH indicated that J.R.S. had "peer problems" after relocating to a new school; had a traumatic house fire experience, causing an increased sense of fear and anxiety; and suffered from separation anxiety when forced to leave his mother. (T. 274).  "Goals" were listed, including increasing self-awareness and coping skills relating to feelings of anxiety when separating from his mother on a daily basis to attend school;" connecting feelings related to separation; engaging in "increased quality time" with the attachment figure; working toward developing

---

[7] It is unclear who actually diagnosed J.R.S. with these impairments.  The reports seem to indicate that J.R.S. was actually examined by Meaghen Pierce, a Social Worker and Therapist, and the report was "approved" by Dr. Geoffrey Hopkins, M.D., a psychiatrist. (T. 280).  Because Dr. Hopkins approved the report, the court will attribute the diagnosis to him.  The date of diagnosis is also unclear because on one part of the report, it states that the PTSD was "identified" on February 2, 2012, and at the bottom of the page, it states that the "Axis Date" of the PTSD was November 30, 2011.  The exact date of this diagnosis is not relevant to this court's decision.

[8] The reports indicate that J.R.S. apparently believed that his sister had some responsibility for the fire, and was therefore, angry with her, resulting in conflicts. (T. 286, 312).

friendships with peers; and practicing positive self-talk. (T. 275-78). Specifically with respect to the PTSD, J.R.S.'s "goal" was to improve his "areas of life functioning." (T. 278). His objectives were to "process" his current experiences and his "personal strengths" as he continued to "investigate relationships" and "interpersonal options." (T. 278-79).

By May 11, 2012, the treatment notes indicate that J.R.S. "has improved ability to separate from his mother when attending school." (T. 282). J.R.S.'s "becoming upset" and "refusing to come to school has decreased significantly over the past three months." (*Id.*) The treatment notes also state that J.R.S. had "increased awareness of his feelings relating to leaving his mother." (T. 283). J.R.S. had also made "new friends" and had begun "building positive relationships with staff over time. . . ." (T. 284). J.R.S. had decreased focus on the past and was more focused on current events. (T. 285). One negative report by the therapist was that J.R.S. had trouble with his older sister because they were often in conflict. (T. 286). However, when Dr. Noia consultatively examined J.R.S. on September 18, 2012, he noted that J.R.S. was "relaxed and comfortable throughout the testing session," and that there was no evidence of "significant emotional distress during the evaluation." (T. 261). Dr. Noia's only diagnosis was "Learning Disorder, NOS." (T. 264).

In a report dated October 29, 2012, the BCBH therapist noted that J.R.S. had gained knowledge of "coping skills," and although his application of those skills was "inconsistent related to his anxiety," he reported the use of those skills "on the bus." (T. 290). J.R.S.'s family reported "increased tantrumming" when J.R.S. did not get his

way. (*Id.*) J.R.S.'s mother "reported" that she felt "smothered" by her son because he was "consistently sitting on or hugging her."[9] (*Id.*) It was also reported that J.R.S.'s somatic complaints "appeared to decrease in school," and he was "addressing" developing friendships with peers at his new school, but had struggled with bullying on the bus." (T. 291-92). J.R.S. was sharing detailed information about his memories from the fire and reported how the trauma caused fear and anxiety related to death. (T. 293). However, J.R.S. and the therapist "processed irrational thoughts of death and how to cope with feelings of anxiety as they occur." (T. 293).

By January 25, 2013, J.R.S. "continued to demonstrate mastery of coping skills," but denied the use of these skills outside the therapy sessions. (T. 299). J.R.S. reported a decrease in anxiety in relation to separating from his mother, but "at times" reported struggling to wake up in the morning to meet his bus. (*Id.*) J.R.S. reported sleeping in his parents' bedroom and watching television late at night. His "family" continued to report "tantrumming" behavior when he did not get his way.[10] (*Id.*) His peer relationships had improved, and he made friends on the bus, even though he was still having some trouble with "negative qualities," such as name-calling and pushing/ fighting. (T. 301). J.R.S. continued to identify feelings of anger toward his sister, stating that she instigates "issues" which result in physical altercations. (T. 303).

---

[9] The court would point out that neither PTSD, nor any resulting separation anxiety were listed as disabling impairments on the plaintiff's application for disability benefits. (T. 62, 162). Plaintiff alleged disability because J.R.S. was "Learning Disabled." (*Id.*)

[10] The court notes that none of the IEPs or the school reports state that plaintiff had any behavioral problems, and there is no mention of plaintiff having a tantrum about anything.

By April 25, 2013, J.R.S. "denied issue with separating from his mother," and denied the use of "coping skills" to accomplish this change. (T. 308). School staff reported that J.R.S. did "very will once in the class room and has not demonstrated issue with separation anxiety recently." (T. 308). It was reported that when his mother brought him to school, J.R.S. tended to "struggle with focus for a period of time and can be emotional at times." (T. 308). School staff further reported that J.R.S. "appears to demonstrate effective social skills, *no issues were reported*." (T. 310) (emphasis added). He identified "positive ways to interact with peers," and the school staff "confirmed that he has effectively demonstrated social skills with peers in the classroom." (*Id.*)

As stated above, the presence or diagnosis of a disease or impairment is not, by itself, sufficient to deem a condition severe. *Hamilton v. Astrue*, 2013 WL 5474210, at *10. Even if the ALJ erred in this case in failing to mention the diagnosis of PTSD, it is clear that this impairment did not cause further limitations in the domains of functioning than were already considered by the ALJ. Notwithstanding plaintiff's claim that J.R.S. had PTSD and separation anxiety, there are no "limitations" stated as a result of this impairment.[11] The only limitation mentioned by the therapist appears to be the alleged "separation anxiety," however, by April of 2013, J.R.S. denied that he

---

[11] Plaintiff cites all the therapist's notes and states that "clearly a traumatic house fire has significantly affected Claimant mentally, hence the diagnosis of PTSD." (Pl.'s Br. at 12). However, as stated above, even the BCBH's therapist's notes do no indicate serious functional limitations as a result of the PTSD, and school records do not mention the impairment (until J.R.S.'s father mentioned the diagnosis). J.R.S.'s father testified that J.R.S. was being treated for PTSD on a weekly basis. (T. 38). However, the treatment records belie any limitations as the result of the PTSD diagnosis.

16

had separation anxiety. (T. 308). J.R.S.'s school records, and the reports of school staff to his therapist show that J.R.S. did not suffer anxiety at school, and that he made friends with his peers and even helped other children with disabilities. (T. 231, 284, 310).

In fact, although the plaintiff argues that the ALJ failed to find the PTSD "severe," the school records only mention PTSD once, and the notation was simply that the diagnosis would be put in J.R.S.'s file "in case" the diagnosis affected his abilities in school. Plaintiff does not point to any limitation in any of the domains which was caused or made worse by J.R.S.'s PTSD, nor has plaintiff argued which domain would be affected by this impairment.[12] All plaintiff's documented limitations were considered in the ALJ's analysis of functional equivalence. (T. 25-29). Thus, there is no indication that PTSD was "severe," and if so, any error in mentioning the diagnosis was harmless.

## VII. <u>Acquiring and Using Information</u>

### A. **Legal Standards**

The regulations provide that the domain of "Acquiring and Using Information" involves determining how well the child acquires or learns information and how well the child uses the information that he has learned. 20 C.F.R. 416.926a(g). SSR 09-3p

---

[12] J.R.R's school records indicate that he has less than marked, and often no limitation, in interacting and relating with others. The ALJ found a less than marked limitation in this domain. The limitations, if any, appeared to be with his communications skills and not in his relationships with others. (T. 27). J.R.S. liked to please his teachers cooperated with his classmates (T. 144), was working on developing closer relationships with peers, looked forward to carrying out a weekly classroom job (T. 175-76), was always very respectful, always had a smile on his face, and specifically had no behavior problems. (T. 178-79, 199).

provides that school-age children from ages 6 to 12 learn to read, write, and do simple arithmetic; become interested in new subjects and activities; demonstrate learning by producing oral and written projects, solving arithmetic problems, taking tests, doing group work, and entering into class discussions. SSR 09-3p, 2009 WL 396025, at *5 (S.S.A. Feb. 17, 2009).

The ruling also lists possible limitations in the domain. These limitations include failure to demonstrate an understanding of words that describe concepts such as space, size, or time; inability to rhyme words or sounds; difficulty remembering what he or she learned in school the day before; inability to use age-appropriate language; the failure to develop "readiness skills" the same as peers; the failure to read, write, or do arithmetic at the appropriate grade level; difficulty with comprehending written or oral instructions; struggles with following simple directions; talking only in short, simple sentences; and has difficulty explaining things. *Id.* at *6.

### B.    Application

Plaintiff argues that the ALJ erred in finding that plaintiff had a "less than marked" limitation in the domain of acquiring and using information. Plaintiff notes that the ALJ gave "great weight" to the opinion of plaintiff's teacher Ms. Rummans, while ignoring the fact that Ms. Rummans found "numerous obvious problems" and one serious problem in this domain.[13] (Pl.'s Br. at 14-16). Plaintiff states that the ALJ engaged in "picking and choosing" only the favorable parts of J.R.S.'s evaluations in

---

[13] Ms. Rummans made these findings in a questionnaire, dated December 20, 2013. (T. 197).

determining that he had a less than marked limitation in this domain.[14]  This court does not agree.

Ms. Rummans found that J.R.S. had no problems comprehending and doing math problems; had a slight problem comprehending oral instructions; had "obvious problems" understanding school content and vocabulary, reading and comprehending written material, understanding and participating in class discussions, expressing ideas in written form, learning new material, recalling and applying previously learned material, and applying problem solving skills in class discussion; and had a "serious" problem in providing organized and oral explanations and adequate descriptions. (T. 197).  Ms. Rummans stated that although J.R.S. can read and write independently, due to "slow processing," his written work is very labored, and he has a "slowness about him in almost all he does.  Understanding and using grade level content vocabulary is very hard for him. (T. 197).  Plaintiff argues that the combination of these issues should have resulted in a finding of a "marked limitation."[15]  Plaintiff's assumption that several "obvious problems" and one "serious" problem should be the equivalent of a "marked" limitation is not supported by the evidence in the record relating to the acquisition and use of information.

A review of the evidence of record does not support the plaintiff's assumption. On October 14, 2013, J.R.S. had a clinical evaluation of language fundamentals. (T.

---

[14] Plaintiff states that "Ms. Rummans opined numerous obvious problems combined with a serious problem in the domain of acquiring and using information, so it is unclear why Ms. Rummans' [sic] opinion, . . . would not amount to a marked limitation." (Pl.'s Br. at 15).

[15] The ALJ did find a marked limitation in Attending and Completing Tasks. (T. 26).

228).  The report states that, during the testing session, J.R.S. had "good attention to tasks." (*Id.*)  J.R.R. scored "above average" in the area of "concepts and following directions;" average in the area of "word structure;" average in the area of "recalling sentences;" and "average" in the area of formulating sentences. (*Id.*)  J.R.R.'s "core language standard" was in the "average range" when compared to other students his age. (*Id.*)  Based on the scores, he was no longer eligible for speech/language services. (*Id.*)

In an assessment of J.R.S.'s academic performance,[16] dated December 4, 2013 – shortly before Ms. Rummans completed the Questionnaire cited by plaintiff – it is noted that plaintiff's 2011 IQ score was "exactly average." (T. 229).  The report also noted that from September of 2013 to December of 2013, J.R.R. "met his goal" of improving his vocabulary, and although he still had an issue with being on task, and was still almost a year below grade level reading, he was "making progress on fluency." (T. 230-31).  He improved his writing skills, but was still below average. (*Id.*)  He had made some progress in math, and was performing slightly below grade level. (*Id.*)

J.R.S. did not show significant regression of learned skills after an extended break, and his reading and language skills showed improvement from fall to winter after a week-long break. (T. 232).  His fall scores showed an improvement from the data received from New York,[17] and his rate of progress was "average." (*Id.*)  This

---

[16] This document indicates that the evaluation was also performed by Ms. Rummans. (T. 229-33).

[17] J.R.S. and his father had, at one time, moved to Colorado to live. (T. 38, 44, 48).  J.R.S.'s father testified that they moved to Colorado in August of 2013. (T. 44).

narrative report is consistent with the ALJ's evaluation of Ms. Rummans's Questionnaire and the ALJ's finding that J.R.R. has a "less than marked" limitation in acquiring and using information. The findings are also consistent with Dr. Noia's evaluation, keeping in mind that Dr. Noia's evaluation was written in September of 2012, and the 2013 evaluations noted J.R.R.'s improvement. The non-examining consultants found that plaintiff had a less than marked limitation in the domain of acquiring and using information. (T. 67-68). Conflicts in the evidence are for the ALJ to evaluate, and ALJ Koennecke's decision is supported by substantial evidence in the record.

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that the Commissioner's decision is **AFFIRMED**, and the complaint **DISMISSED**, and it is further

**ORDERED**, that the Clerk of the Court enter judgment for **DEFENDANT.**

Dated: October 20, 2016

Hon. Andrew T. Baxter
U.S. Magistrate Judge